IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 7, 2019

**STATE OF TENNESSEE v. BRANDON JOHNSON**

**Appeal from the Criminal Court for Shelby County**
**No. 16-02052    Lee V. Coffee, Judge**

_____

**No. W2018-01222-CCA-R3-CD**
_____

Following a jury trial, the Defendant, Brandon Johnson, was convicted of premeditated first-degree murder and unlawful possession of a firearm by a convicted felon, for which he received an effective sentence of life plus ten years. On appeal, the Defendant contends that (1) the trial court erred by failing to suppress three lineup identifications that were unduly suggestive; (2) the trial court erred by refusing to sever the unlawful possession of a firearm by a convicted felon offense from the first-degree murder count, thereby preventing him from receiving a fair trial; and (3) the evidence was insufficient to support his convictions. Following our review, we affirm the Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Laurie Winstead Hall, Memphis, Tennessee (on appeal); and Juni S. Ganguli (at trial), Memphis, Tennessee, for the appellant, Brandon Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carolyn Alanda Dwyer and Meghan Fowler, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from the March 7, 2015 shooting death of LaDarius Brooks ("the victim"), who was nicknamed "Tall 40." The Defendant was charged with the first-degree premeditated murder of the victim and unlawful possession of a firearm by a convicted felon. See Tenn. Code Ann. §§ 39-13-302, -17-1324. After a jury trial on

February 14-16, 2018, the Defendant was found guilty as charged. Thereafter, the trial court imposed a statutory life sentence for the first-degree murder conviction and, after a sentencing hearing, a consecutive ten-year sentence for the unlawful possession of a firearm conviction.

A. Motion to suppress. Before trial, the Defendant filed a motion to suppress three photographic lineup identifications. In the motion, the Defendant argued that the police had "emphasized" the Defendant as a suspect because none of the witnesses knew the Defendant or had described him at the crime scene, and the Defendant's photograph was different from the others in the lineup. In particular, the Defendant stated that he was the youngest individual pictured, that he was the only one with his head tilted toward the left, and that the photograph was lighter in exposure than the others.

At the suppression hearing, Matthew Townsel[1] identified a March 8, 2015 photographic lineup that he completed at the Memphis Police Department, on which he had circled a photograph. Below the photographs, Matthew had written, "[This] is who [I] know [as] Lil B. I saw him shoot 40." Matthew testified that he identified the person he saw. On cross-examination, Matthew stated that on the day of the shooting, he was alone on the porch of his home, that the porch light was not on, and that the shooting occurred at night. Matthew denied smoking or drinking alcohol generally or on that evening. He did not recall how far away the shooter was, although he said the shooter was not close to him. Matthew compared the shooter's position to an unspecified distance inside the courtroom. Matthew stated that "Lil B" was "out there" and that his view was unobscured. The streetlight was not functioning and "[e]verything was out." Although Matthew did not know the shooter, he had seen the shooter on an occasion one month previously. The shooter did not wear anything covering his face and had arrived in a white car.

Officers "made" Matthew come to the police department on March 9, 2015. Matthew informed officers that he could not read or write well before completing the lineup, and the officers read an "advice to witness statements" document to him. The officers held up a photographic lineup and Matthew pointed at Lil B's photograph. He denied that the officers said anything to him during the lineup. Matthew noted that he did not wish to testify in this case.

Vernon Griggs testified that he knew the Defendant, who was also known as Lil B, through a friend and that he drove the Defendant to the victim's house on March 7, 2015. Mr. Griggs stated that he saw the Defendant shoot the victim, and Mr. Griggs identified

---

[1] Multiple members of the Townsel family were present during the shooting. Kimberla Townsel and Matthew Townsel were the only ones to testify in this case, but it is necessary for context to refer to Joshua and Jeremy Townsel by name. For clarity, we will refer to Kimberla Townsel as "Ms. Townsel" and Matthew, Joshua, and Jeremy Townsel by their first names. In doing so, we intend no disrespect.

the Defendant in the courtroom. Mr. Griggs had known the Defendant for about one and one-half years before the shooting. After the shooting, the Defendant "jumped" into the back seat of Mr. Griggs's car, and Mr. Griggs drove them away. Mr. Griggs subsequently completed a photographic lineup with Memphis police officers, who asked him to identify the shooter. He denied that the officers gave him "any indication" or "any hints or any help" regarding who they wanted him to choose. Mr. Griggs circled the Defendant's photograph and wrote, "This is Little B[,] the guy with the gun who I [saw] shooting [a]t Tall 40."

On cross-examination, Mr. Griggs testified that he was in the victim's yard by a tree during the shooting and that his location was about twenty feet away from both the victim and the Defendant, who were standing next to one another. The shooting occurred at night, and Mr. Griggs's view was unobscured. He saw "Tall 40 hit the ground." The incident lasted about three minutes.

Kimberla Townsel, Matthew Townsel's mother, testified that she did not witness the shooting, although someone told her Lil B was the shooter. She had known who Lil B was for six months before the shooting, and he had been to her house previously, although she did not know his legal name. The police asked Ms. Townsel to identify the person she knew as Lil B in a photographic lineup. She denied that the police hinted at or told her who to choose. Ms. Townsel circled the Defendant's photograph and wrote, "The person I picked is number 3 and [h]is street name is [L]il [B]." On cross-examination, Ms. Townsel identified the Defendant in the courtroom as Lil B. She acknowledged that on the day of the shooting, she did not know that anyone had come to her house.

The trial court noted that it had allowed defense counsel to orally amend the motion to suppress in order to allow expanded testimony on the opportunity of the witnesses to see the Defendant during the shooting in order to address the admissibility of in-court identifications. The court considered the totality of the circumstances pursuant to Neil v. Biggers, 409 U.S. 188, 198-99 (1972), and State v. Rodriguez, 752 S.W.2d 108 (Tenn. Crim. App. 1988), including the witnesses' opportunity to view the Defendant. The court found that Matthew had known the Defendant, who had the street name Lil B, for about one month, that Matthew was present when the shooting occurred, and that he saw the Defendant. Matthew's view was unobstructed; it was nighttime and no exterior lights were illuminated, Matthew did not smoke or drink, and the shooting occurred forty or fifty feet away.[2] The shooter, whose face was uncovered, arrived in a white car, and Matthew did not know how long the incident lasted. The police did not suggest a photograph to Matthew during the lineup, and Matthew identified the Defendant as the person he saw shooting.

---

[2] The trial court presumably used Matthew's comparison of the distance in the courtroom to arrive at this conclusion.

The trial court found that Mr. Griggs had known the Defendant for one and one-half years, that Mr. Griggs transported the Defendant to the location of the shooting, that Mr. Griggs saw the Defendant shoot "Tall 40," and that Mr. Griggs identified the Defendant in court. The court also found that the shooting took place twenty feet from Mr. Griggs, that the Defendant was within arm's length of the victim, that the incident lasted three minutes, and that after the Defendant shot and killed the victim, Mr. Griggs drove the Defendant away.

The trial court found relative to Ms. Townsel that she was not a fact witness and did not see the shooting, that she provided identification "as to exactly who Lil B was," and that she identified the Defendant as Lil B. The court found relative to Matthew and Mr. Griggs that they had an opportunity to view the shooter, that they "were looking right at" the shooting, and that they identified the Defendant as the shooter within one or two days of the shooting. The court noted that the record did not indicate whether any description of the shooter had been provided to the police. The court found that no erroneous identifications or failures to identify the shooter occurred and that relevant to their level of certainty, "they both expressed[] that this is Lil B, the person that they know, and the person that they saw commit this crime."

The trial court concluded that "there [wa]s nothing unduly suggestive about the pretrial identification procedure." The court found that both Mr. Griggs and Matthew knew the Defendant and thus had an independent origin of the identification. The court noted that Mr. Griggs transported the Defendant to and from the shooting. The court found that the Defendant's lineup photograph was not "drastically different" from the other five photographs and that the witnesses affirmed the police did not suggest a suspect or pressure them to choose a certain photograph. The court denied the Defendant's motion.

B. <u>Motion to Sever</u>. The Defendant filed a motion to sever the charges for first-degree murder and possession of a firearm by a convicted felon pursuant to Tennessee Rules of Criminal Procedure 8 (Joinder) and 14 (Severance).[3] He argued that the trial court "had the discretion" to sever the counts and that he would be unduly prejudiced by a joint trial because "the jury will confuse the evidence . . . and convict [the Defendant] of both." The Defendant further argued that because no gun was recovered in his possession, there was "a distinct possibility that he would not be convicted of either count if the evidence were separate" and that because the Defendant was accused of two crimes, the jury may have concluded he had a "criminal disposition." In support of his motion, the Defendant cited Tennessee Rule of Evidence 404(b) governing the

---

[3] We note that in the motion, the Defendant mistakenly attributed language from Rule 8(b) (permissive joinder) to Rule 8(a) (mandatory joinder), cited language from Rule 14(b)(1) governing severance in cases of permissive joinder of offenses, and discussed caselaw on the standard for dismissing a pretrial consolidation motion.

-4-

admissibility of evidence of prior bad acts. The Defendant contended that he was "unaware of the specific legitimate purpose . . . [for] the prosecution [to] introduce evidence of his being a convicted felon . . . . [It] would appear that the overriding intention of trying both counts at the same time would be to prove his violent character and scare the jury."

The trial court found that the charges in this case were subject to mandatory joinder and that pursuant to this court's opinion in State v. Quantez Person, No. W2016-01945-CCA-R3-CD, 2018 WL 447122 (Tenn. Crim. App. Jan. 16, 2018), severance would result in the State's violating principles of double jeopardy. The court concluded that the Defendant's remedy for any concerns of prejudice was to stipulate to his criminal record, under which circumstances the jury would not learn the particulars of his convictions and only that he had previously been convicted of a crime involving violence. The court noted that our supreme court's opinion in State v. James, 81 S.W.3d 751 (Tenn. 2002), dictated that the offenses "have to be joined, have to be consolidated for trial" because the Defendant's status as a felon was a "material element of the offense[.]"

Relative to bifurcation, the court considered this court's statement in multiple cases declining to criticize bifurcation as an available procedure[4] but noted that no caselaw existed approving bifurcation in this type of case, stating, "[T]he reason [bifurcation] has not been criticized by the appellate courts [is] because there [are] no cases on point in which a person has asked for bifurcation, which I do not know of any mechanism under Tennessee law that will allow this to be bifurcated." The court denied the Defendant's motion.

The Defendant subsequently stipulated to his March 8, 2011 convictions for "crimes of violence or attempted violence" against four victims in case number 10-03895, and to his being on notice from the court "that he would commit a crime if he owned, possessed, or handled a firearm" after that date.

C. Trial. Shirley Brooks, the victim's mother, testified that two men informed her that her son was in "poor condition," that she went to the crime scene one street away from her house, and that when she arrived, she borrowed a cell phone to call a minister. The victim passed away the following day, Sunday. Ms. Brooks identified the victim in an autopsy photograph.

---

[4] See State v. Stephan Richardson, W2016-02227-CCA-R3-CD, 2018 WL 821775, at *16 (Tenn. Crim. App. Feb. 9, 2018) ("[We] feel constrained to note our agreement that bifurcation is indeed the better procedure."); State v. Carlos Smith, W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013) ("[Bifurcation] . . . has not been criticized by our appellate courts"); State v. Taft Arkey Murphey, M2007-00403-CCA-R3-CD, 2008 WL 4735494, at *3 (Tenn. Crim. App. 2008) (noting the bifurcated proceeding in that case).

Mr. Griggs testified consistently with his suppression hearing testimony. He added that on March 7, 2015, he was at work when he heard that "Fat," whose legal name was Demetris Miller, had been shot. Mr. Griggs explained that an unidentified person had tried to rob Mr. Miller, that his understanding was the Defendant had been present, and that Mr. Miller had been shot. Mr. Griggs acknowledged that he was not present when Mr. Miller was shot. Mr. Griggs left work and went home. "Lil B," who Mr. Griggs identified as the Defendant, was dropped off at Mr. Griggs's house, and the two men left to go to the hospital and visit Mr. Miller.

Instead, they stopped by Ms. Townsel's house, which was where "Tall 40" was. Mr. Griggs identified Tall 40 as the victim. Mr. Griggs and the Defendant went inside the house, sat down in the living room with "Anthony,[5] . . . Josh[ua Townsel], and Matthew [Townsel]," and spoke about Mr. Miller. The victim was in a back room, and Mr. Griggs did not see Ms. Townsel. The Defendant went outside and three to five minutes later, Mr. Griggs, the victim, and Anthony went outside. The Defendant was standing outside the fence and speaking to Joshua. Mr. Griggs slipped on a patch of ice on the front steps, and the victim and Anthony laughed at Mr. Griggs as they walked past him. When Mr. Griggs stood up, the victim and Anthony had walked outside the fence and "[t]hat's when the shooting started."

Mr. Griggs testified that the Defendant pulled out a gun and told the victim, "You set bro up" before beginning to shoot at the victim. The victim began to scream and run toward the house and said, "I didn't set bro up. I didn't have nothing to do with it." Mr. Griggs was behind a tree as this occurred and could see the events clearly. No one was present during the shooting except for Mr. Griggs, the Defendant, and the victim. As the victim made his way toward the house, the Defendant continued to shoot at him, and the Defendant ran out of bullets as the victim reached the porch. The Defendant fired five or six times in total. The Defendant attempted to pull out another gun, but Mr. Griggs "smacked" the Defendant's wrist and told him not to do it. An unidentified person inside the house tried to pull the victim inside. Mr. Griggs walked to his car, a white Lincoln, unlocked it, and "jumped in" the driver's seat. The Defendant got into the backseat, and Mr. Griggs "backed up the street." The Defendant carried a revolver, which he used to shoot the victim, and a black semiautomatic pistol.

Mr. Griggs testified that when he asked the Defendant why he shot the victim, the Defendant responded that "he would want [Mr. Griggs] to do the same thing for him . . . if something like that happened to him." Mr. Griggs explained that the Defendant meant if the Defendant were shot, he wanted Mr. Griggs to retaliate. Mr. Griggs took the Defendant to the Defendant's brother's apartment complex about ten minutes away.

---

[5] Anthony's surname is not contained in the record and was not known to any of the witnesses at trial. We intend no disrespect.

Mr. Griggs identified photographs of Ms. Townsel's house, the front porch of the house, the yard, the sidewalk, and the Defendant's brother's apartment complex. The photographs showed patchy snow on the ground. Mr. Griggs identified where the Defendant, the victim, Anthony, and he stood at various points during the incident. Mr. Griggs stated that the victim and the Defendant stood about twenty feet from him when the shooting started. Mr. Griggs agreed that the street light above his car was illuminated. Two or three days after the shooting, Mr. Griggs spoke to the police after his mother called the police department and was informed that the detective wanted to speak to "Veno, the driver of the Lincoln." Mr. Griggs stated that his nickname was Veno. Mr. Griggs gave a statement to the police and identified the Defendant in a photographic lineup. He agreed that the police gave him appropriate instructions before the lineup and did not help him choose a photograph. When asked why he did not approach the police sooner, Mr. Griggs stated, "I felt like I had nothing to do with it . . . . I was hoping that [the police] would . . . lock him up and leave me alone." Mr. Griggs admitted, though, that he was afraid he would also be arrested because he "played a part in driving" and stated that he "had to" speak to the police.

On cross-examination, Mr. Griggs testified that Mr. Miller had been shot during the sale of a gun and that Mr. Griggs was not present during the sale. The Defendant was upset and sad that Mr. Miller had been shot. To Mr. Griggs's knowledge, the Defendant was not armed when they drove to Ms. Townsel's house. Mr. Griggs stated, though, that the Defendant would have been permitted to ride with Mr. Griggs if he were armed. Mr. Griggs did not remember why he drove to Ms. Townsel's house and denied the Defendant "order[ed]" him to go there. He clarified that although he stayed in the living room and talked with the others about Mr. Miller, the Defendant and Joshua Townsel walked out together after "[e]verybody spoke, whatever they [were] talking about[.]" Mr. Griggs stated that no one in the house knew who shot Mr. Miller and that they knew the injuries were not life threatening. The victim then joined the conversation for about five minutes before Mr. Griggs left. Mr. Griggs denied that the Defendant threatened the victim in the living room and agreed that the Defendant was outside the house while the victim was present. Mr. Griggs ran to a tree in the yard when he heard the first shot, and "everybody else outside the fence" ran toward the street. After the Defendant ran out of bullets, he walked inside the fence near where Mr. Griggs stood and pulled out the second gun. Mr. Griggs denied that the Defendant fired toward the house "until [the victim] made it into the house." Mr. Griggs acknowledged that he had not been charged in connection with the shooting.

Matthew testified consistently with his suppression hearing testimony. He added that on March 7, 2015, he lived with his mother, siblings, and niece. That evening, he went to Walmart with two friends, "Ant" or Anthony, and "Cowboy," whose legal name was Rizario Reed. He did not know his friends' legal names at that time. Matthew

received a telephone call, after which the group returned to his house. Matthew noted that he always turned the porch light off when arriving home.

Anthony, Joshua, Jeremy, the victim, Ms. Townsel, and Matthew's sister were at the house, and Ms. Townsel, Matthew's sister, and the victim were in a back room. Matthew explained that his sister was "doing [the victim's] hair." The Defendant and Mr. Griggs arrived at the house about thirty minutes later. Matthew had known Mr. Griggs as "Veno" for about two years, although he did not know Mr. Griggs's legal name. Matthew knew the Defendant's street name through Mr. Miller and Matthew's brother. The Defendant and Matthew were not friends, although Matthew knew the Defendant by sight. Mr. Griggs told the men in the living room "what was going on," the victim came out of the back room, and Matthew told everyone present to go outside. The Defendant left first, then the victim, Mr. Griggs, Matthew, and Jeremy. Matthew stated, however, that he was uncertain of the order in which the men left, other than he was the last to leave. Matthew stood on the porch; the victim was in front of the gate; and Mr. Griggs, the Defendant, and Joshua[6] were outside the gate. Matthew saw his father walk up and ask "them what was going on," Matthew turned to go inside, and he heard shots. When Matthew turned around, he saw the victim running toward the house. The Defendant was holding a gun, although Matthew did not know what type of gun it was. Matthew denied that the victim had a gun.

Matthew saw the Defendant shoot at the victim while saying, "You set my brother up[.]" The Defendant repeated the statement more than once. The victim denied setting up anyone and reached the porch. The Defendant continued to fire as Matthew went inside and told his mother the victim had been shot. Matthew did not tell his mother who had shot the victim. The shots stopped when Ms. Townsel went onto the porch. Matthew denied seeing anyone with a gun other than the Defendant. Matthew did not know where Mr. Griggs or Joshua stood during the shooting.

Ms. Townsel pulled the victim inside, and Matthew "snatched" his mother inside because he saw the Defendant point the gun toward the house. Matthew heard Mr. Griggs say, "Don't shoot up there[.]" Matthew's sister called the police, and Matthew left to inform the victim's mother what had occurred. Matthew indicated on the photographs of the house and yard where he, the victim, the Defendant, and Mr. Griggs stood before the shooting. The Defendant stood outside the front gate and did not move as he fired. Mr. Griggs drove a white car that night. Matthew denied hearing an argument. He also denied that it took him time to figure out who was shooting. He said that he knew "when [he] first turned around" who was shooting, although it was dark outside. Matthew saw that the victim had been shot in the back. He gave a statement to the police on March 8, 2015, and identified the Defendant in a photographic lineup after

---

[6] We note that Matthew referred to both Joshua and Jeremy inconsistently during his testimony, and it is not clear where each of them were during the incident.

receiving appropriate instructions from the police. Matthew also identified Mr. Griggs in a second photographic lineup, on which he had written, "[This] is who [I know as] Veno. [This] is the person that was with [L]il B when [he] shot 40."

On cross-examination, Matthew agreed that he could not read well. He denied telling police officers that Mr. Griggs and the Defendant were at his house when he returned from Walmart. Matthew stated that the Defendant stayed in the living room with the group, that Jeremy left, and that the Defendant did not speak. Matthew asked everyone to leave because he did not like the Defendant and did not want the Defendant in his mother's house. When everyone left, the victim went into the back room, where Ms. Townsel was, to retrieve his jacket. The victim eventually followed the group outside. Matthew stated that the front gate was about twenty feet from the porch. Matthew stated that he had attention deficit hyperactivity disorder (ADHD), that he had never taken his prescribed medication, and that his ADHD did not affect his memory.

Ms. Townsel testified consistently with her suppression hearing testimony. She added that the victim was her boyfriend and stayed with her sometimes. On March 7, 2015, her daughter was styling Ms. Townsel's hair in her daughter's bedroom on the third floor of the house. The victim was present. They received a telephone call informing them that a mutual friend had been shot. The victim went to the front of the house, and Ms. Townsel walked toward her bedroom in the back of the house. At that point in time, no one other than her children were in the house. Ms. Townsel thought she heard fireworks, ran to the front of the house, and encountered Matthew at the front door, who told her the victim had been shot by "Little B." Ms. Townsel stepped onto the porch and saw a person with a gun. She heard someone else say, "Don't shoot up there, bro." The victim came onto the porch and "pushed" Ms. Townsel, and Matthew pulled her back into the house. Ms. Townsel did not see the shooter long enough to describe him. She did see a white vehicle, though. Ms. Townsel called the police after bringing the victim inside the house. Ms. Townsel spoke to "the ambulance" before they arrived and applied a towel to the victim's wounds to staunch the bleeding. The victim looked up at Ms. Townsel and said, "I didn't have nothing to do with that, bro," and told Ms. Townsel's daughter that he loved her.

Ms. Townsel was distraught when the police arrived, and they did not interview her that night. Ms. Townsel later identified the Defendant in a photographic lineup as Little B. Ms. Townsel stated that in the six months prior to the shooting, the Defendant had been at her house four or five times. Ms. Townsel had known Mr. Griggs for "some years" through a friend of her children. She did not know the Defendant or Mr. Griggs had been in her house before the shooting, and she could not identify anyone who was in the yard during the shooting because it was dark and she did not have an opportunity to see them.

Memphis Police Officer Jamie Lambert testified that on March 7, 2015, he was dispatched to the crime scene at Ms. Townsel's house. His supervisor, Lieutenant Jesse Noams, was the first on the scene. Officer Lambert arrived at about 10:00 p.m. and saw that the victim had a gunshot wound to the lower back. Ms. Townsel was present and was "very emotional, upset." He did not recall anyone else's presence in the house. Officer Lambert noted that no bullet casings were recovered in this case, which was consistent with a revolver having been fired. Officer Lambert explained to the jury the difference between a revolver and a semiautomatic pistol. Upon questioning from the trial court, Officer Lambert stated that revolvers generally held five or six bullets.

Memphis Police Lieutenant John Stone testified that on March 7, 2015, he was a crime scene investigator and went to Ms. Townsel's house to photograph the scene. He stated that although it was dark, "there was still plenty of ambient and oblique lighting" from the street lights and other houses. He agreed that he could see the street from the front porch and that although it was a "little dim," he could see the porch from the street. Lieutenant Stone also agreed that he could identify Officer Lambert, who was standing on the porch, from his position in the front yard. Lieutenant Stone and Officer Lambert searched for bullet casings but did not find any. Lieutenant Stone agreed that if a revolver had been used in the shooting, he would not expect to find any bullet casings.

Shelby County District Attorney's Office Investigator William Merritt testified that he prepared a map of the relevant neighborhood in this case, which was entered as an exhibit. He marked the addresses for Ms. Townsel's house, Mr. Griggs's house, and the Defendant's brother's apartment. Investigator Merritt noted that it took two or three minutes to drive from Mr. Griggs's house to Ms. Townsel's house and that Ms. Townsel's house was in the same direction as the hospital from Mr. Griggs's house. It took Investigator Merritt about fifteen minutes to drive from Ms. Townsel's house to the Defendant's brother's apartment.

Memphis Police Sergeant Gladys Burton testified that she was the case coordinator in the victim's murder investigation. She received the case on March 8, 2015, when the victim died. Joshua Townsel had given a statement by the time she received the file. Sergeant Burton asked Ms. Townsel and Matthew to come in for an interview. The Defendant's legal name had been obtained by investigating officers the night of the shooting. Sergeant Burton asked Ms. Townsel if she was familiar with someone named Little B, gave her lineup instructions, and showed her a photographic lineup. Ms. Townsel agreed to "follow the rules" and made an identification. Sergeant Burton denied suggesting a photograph to Ms. Townsel or giving her "hints[.]" Matthew told Sergeant Burton that he could not read well, and Sergeant Burton read his "photo advice of rights" to him aloud. Matthew agreed to "abide by those rules[.]" Sergeant Burton did not suggest a photograph to Matthew. Matthew also identified the driver of the white car as "Veno." Matthew and Ms. Townsel each gave statements, which

Sergeant Burton typed.  Sergeant Burton read the statement aloud to Matthew and allowed Ms. Townsel to review hers.  Both of them initialed and signed their statements.

After some research, another officer identified Veno as Mr. Griggs and Fat as Mr. Miller.  The other officer subsequently met with Mr. Miller, and no information was discovered to indicate that the victim was involved in Mr. Miller's shooting.

Sergeant Burton contacted Mr. Griggs through his mother and asked him to come to the police station.  Mr. Griggs's interview was conducted by another officer, but Sergeant Burton noted that Mr. Griggs was cooperative.  After the interview, Sergeant Burton tried to contact Joshua in order to obtain a second statement from him regarding the guns and to complete a photographic lineup, but she was unable to do so.  The police began to search for the Defendant, including notifying his family members that they were looking for him, and eventually issued an arrest warrant on "about" March 24, 2015.  After a period of time, the police enlisted the help of the United States Marshals, and the Defendant was arrested on June 4, 2015.  On cross-examination, Sergeant Burton testified that she called Mr. Griggs's mother on March 10, 2015, which was not reflected in her written report.

Deputy Medical Examiner Dr. Marco Ross, an expert in forensic pathology, testified that he conducted the victim's autopsy.  He identified a photograph of a gunshot entry wound to the left buttock, corresponding x-rays showing the bullet in the buttock, and a photograph of the bullet once it was removed.  Dr. Ross described the bullet as a "jacketed bullet" of between .32 and .40 in caliber.  Dr. Ross opined that this wound was not lethal.

Dr. Ross identified two photographs of a gunshot entry wound to the right flank, an x-ray showing the bullet in the abdomen, and a photograph of the bullet after its removal.  The bullet was also jacketed and between .32 and .40 in caliber.  He noted that the bullet entered the right flank, penetrated the lumbar spine, and perforated the "left common iliac artery," a "major dividing branch of the aorta . . . in the abdomen."  Dr. Ross opined that this wound was lethal.  He noted that the victim underwent surgery at the hospital to repair the artery and that after several hours, the victim died as a result of blood loss.  Dr. Ross stated that bleeding to death was not uncommon with this type of wound.

Dr. Ross noted that no gunpowder stippling or soot were present on the wounds and that he could not determine from what distance the shots were fired.  When asked whether the spinal injury would have had impacted the victim, Dr. Ross stated that if only the "bony part of the spine" were impacted, the victim may have had some mobility, which would be consistent with testimony that the victim collapsed on the front porch.

Dr. Ross testified that the victim had some abrasions on the right hand and leg consistent with falling at or near the time of death. He noted that the victim's toxicology report was negative for alcohol and illegal drugs other than marijuana. Dr. Ross stated that the level of marijuana in the victim's blood was consistent with "recreational" use. The significance of the blood level relative to the last time the victim used marijuana depended on his general level of use. Dr. Ross noted that if the victim regularly used marijuana, "his last use may have been two or three days previous" and that if the victim were a "naïve user" the level would have been consistent with use a few hours before death. Dr. Ross testified that the cause of death was the right flank gunshot wound, and the manner of death was homicide.

At the conclusion of the State's proof, the Defendant moved for a judgment of acquittal. The trial court denied the motion, finding that in the light most favorable to the State, the evidence was sufficient to convict the Defendant beyond a reasonable doubt.

Relative to premeditation, the court found that the Defendant procured a weapon, that the victim was unarmed, that the Defendant fired multiple shots and "was in the process of firing some additional shots" when Mr. Griggs stopped him, that the Defendant inflicted multiple wounds, that the Defendant "took off" and could not be located for several months, that the gun was never recovered, and that the Defendant was calm immediately following the killing. The court found that two witnesses had identified the Defendant as the shooter and noted that there was "indicia of flight[,]" which could be used to infer a "consciousness of guilt[.]"

The Defendant did not put on additional proof.[7] Upon this evidence, the jury convicted the Defendant of premeditated first-degree murder and possession of a firearm as a convicted felon. The court imposed a statutory sentence of life for the murder conviction. After a sentencing hearing, the court ordered the maximum in-range sentence of ten years, to be served consecutively to the life sentence, for possession of a firearm by a convicted felon. The trial court denied the Defendant's motion for a new trial, and the Defendant timely appealed.

ANALYSIS

On appeal, the Defendant contends that (1) the trial court erred by denying his motion to suppress photographic identifications of the Defendant by Matthew, Ms. Townsel, and Mr. Griggs; (2) the court erred by denying his motion to sever the

_____

[7] We note that during a jury-out hearing pursuant to Momon v. State, 18 S.W.3d 152 (Tenn. 1999), the Defendant stated repeatedly that he wanted Joshua Townsel to be called as a witness. The trial court discussed with him that it was in defense counsel's discretion whether to call witnesses, that Joshua was incarcerated and available to testify, and that defense counsel had elected not to call this witness because he thought it would hurt the Defendant's case.

possession of a firearm by a convicted felon charge; and (3) the evidence was insufficient to support his convictions. The State responds that the photographic lineups were properly admitted, that the two counts of the indictment were properly tried together, and that the evidence was sufficient to support the jury's verdict.

## I. Motion to Suppress

A trial court's findings of fact on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998); State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's review of the trial court's application of law to the facts is conducted under a de novo standard of review. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

A witness's identification of a defendant in a photographic lineup must be suppressed pursuant to the Due Process Clause of the Fifth Amendment of the United States Constitution when "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968); see State v. Martin, 505 S.W.3d 492, 500 (Tenn. 2016). "The United States Supreme Court has emphasized that 'due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary,' and only if the eyewitness's identification 'is tainted by police arrangement.'" Martin, 505 S.W.3d at 500 (quoting Perry v. New Hampshire, 565 U.S. 228, 238 (2012)).

In determining whether an identification procedure violated a defendant's due process rights under the Simmons standard, in Biggers, the Court established "a two-part analysis to assess the validity of a pre-trial identification." State v. Richard Perkinson, No. E2008-01180-CCA-MR3-CD, 2009 WL 865339, at *7 (Tenn. Crim. App. Mar. 26, 2009). In accordance with the two-part test, if we conclude that the identification procedure was suggestive, we must then determine whether the identification was reliable despite the fact that it was inherently suggestive. Biggers, 409 U.S. at 199. In determining whether the identification was reliable, we must consider the following five factors:

-13-

[T]he opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation.

Id. at 199-200. A conviction based on a flawed identification procedure will be reversed only when the procedure utilized in the defendant's case "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons, 390 U.S. at 384 (1968).

In his appellate brief, the Defendant does not offer any argument that the photographic lineup was suggestive, which was the basis for the pretrial motion to suppress. His brief, instead, recounts testimony relevant only to the first Biggers factor, the opportunity of the witnesses to view the Defendant at the time of the shooting. He then states that "considering the totality of the witness' testimony and applying that testimony to the Biggers factors, the trial court should have granted the motion to suppress."

We note that Simmons and Biggers apply to witness identifications made under suggestive circumstances. That is to say, if the manner in which a photographic lineup is composed or completed is not suggestive, we do not apply the Biggers factors to determine reliability—that is a matter of witness credibility, which is the province of the finder of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) ("Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact.")

The Defendant presents no evidence, and we have found none in our review of the record, that preponderates against the trial court's finding the photographic lineups were not suggestive. Matthew, Ms. Townsel, and Mr. Griggs all testified that they were given appropriate instructions before completing the lineup, that the police did not give "hints" or suggest a photograph to them, and that they chose the photograph based upon their personal knowledge. Matthew further stated that the instructions were read to him after he informed officers he could not read well. It was made clear at the suppression hearing and at trial that Ms. Townsel had not seen the shooting and that her lineup was being presented for purpose of confirming that the Defendant was known to her as having the street name "Lil B." Our review of the color copies of the lineups entered at trial do not reflect that the Defendant's photograph stood out from the others for any reason.

Having concluded that the lineup was not suggestive, we need not consider the Biggers factors for indicia of reliability. Nonetheless, we note that the Defendant was

known to all three witnesses. Mr. Griggs had known the Defendant for one and one-half years, Matthew had known who the Defendant was through friends for about one month, and Ms. Townsel had seen the Defendant at her home five or six times in the six months before the shooting. Mr. Griggs and Matthew confirmed that they saw the Defendant shoot at the victim, and Mr. Griggs drove the Defendant to and from Ms. Townsel's house. Matthew and Mr. Griggs interacted with the Defendant for several minutes inside the house before the group walked outside, and both Matthew and Mr. Griggs had enough light to see the Defendant from their respective positions. The record reflects that the Defendant was immediately and confidently identified as the shooter. The Defendant is not entitled to relief on this basis.

## II. *Unlawful Possession of a Firearm by a Convicted Felon*

The Defendant contends that the trial court erred by declining to sever the homicide charge from the unlawful possession of a firearm by a convicted felon charge. He argued that the court "should have granted the severance and allowed bifurcation of the charges to promote a fair determination of the defendant's guilt or innocence"; that pursuant to Tennessee Rule of Evidence 404(b), evidence of his prior convictions was unduly prejudicial; and that he "did not receive a fair trial with his prior felony conviction[s] weighing in the mind of the jurors[.]"

The State responds that joinder was mandatory in the Defendant's case and that the Defendant stipulated to his felony record "so as to avoid prejudicial evidence regarding his prior crimes." The State notes that the jury was instructed on considering the prior convictions only for the purpose of establishing the elements of the felon in possession of a firearm charge.

As a preliminary matter, the Defendant's original motion only raised severance as an issue. However, the trial court addressed bifurcation, severance, and joinder at some length at the motion hearing. The Defendant incorporates bifurcation, which he conflates with severance, into his brief. Although the bifurcation issue was raised sua sponte in the trial court and not by the parties, we have an adequate record to review the issue.

As pertinent to our review, Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon." There was no dispute that the Defendant had four qualifying prior felony convictions for aggravated robbery.

*(a) Joinder*

Tennessee Rule of Criminal Procedure 8(a) states that two or more offenses shall be joined if the offenses are "based on the same conduct or arise from the same criminal

episode[,]" are "within the jurisdiction of a single court[,]" and are "known to the appropriate prosecuting official at the time of the return of the indictment(s)[.]"

In his appellate brief, the Defendant cites Tennessee Rule of Criminal Procedure 8(a) governing mandatory joinder of offenses but then cites to caselaw governing permissive joinder of offenses. See Tenn. R. Crim. P. 8(b); State v. Toliver, 117 S.W.3d 216 (Tenn. 2003), Spicer v. State, 12 S.W.3d 438 (Tenn. 2000); State v. Shirley, 6 S.W.3d 243 (Tenn. 1999). Mandatory joinder and permissive joinder are governed by separate rules, and considering each type of joinder implicates different findings by the trial court. See Tenn. R. Crim. P. 8(a), (b). We note that joinder is not at issue in this case except as it applies to determining which standard to use for severance. Moreover, all the cases cited by the Defendant relate to multiple indictments, which were consolidated into one trial after a pretrial motion for consolidation. There was no motion to consolidate in this case because the two charges were separate counts of the same indictment.

The trial court correctly found that the offenses in this case were subject to mandatory joinder pursuant to Rule 8(a). The Defendant's possession of the firearm as a convicted felon and the victim's murder arose from the same conduct, the Defendant's shooting the victim. We turn, then, to whether the offenses should have been severed.

*(b) Severance*

Tennessee Rule of Criminal Procedure 14(b)(2) states that a court shall grant a motion for severance of offenses mandatorily joined pursuant to Rule 8(a) before trial when "the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense." We review a trial court's decision relative to severance for an abuse of discretion. State v. Garrett, 331 S.W.3d 392, 401 (Tenn. 2011). "Whether a severance should be granted is a matter entrusted to the sound discretion of the trial court, and this [c]ourt will not interfere with the exercise of that discretion unless it results in clear prejudice to the defendant." State v. Carruthers, 35 S.W.3d 516, 552 (Tenn. 2000). "Reversal is required only when the record demonstrates that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty.'" Id. (quoting Hunter v. State, 222 Tenn. 672, 682 (Tenn. 1969) overruled on other grounds, Hunter v. Tennessee, 403 U.S. 711 (1971)).

The trial court's conclusion that the offenses could not be severed without creating double jeopardy implications was based upon a misunderstanding of this court's discussion of joinder and severance in Person. In Person, the defendant was indicted for aggravated rape. 2018 WL 447122, at *1. After the aggravated rape indictment was issued, the State became aware that the defendant was positive for human immunodeficiency virus (HIV). Id. at *2. Instead of seeking a superseding indictment,

-16-

the State obtained a second, separate indictment for criminal exposure to HIV and did not consolidate the two indictments before the aggravated rape trial, which ultimately ended in a mistrial. Id. Before the second aggravated rape trial, the State moved for consolidation of the two indictments, which was granted under Rule 8(a), and the defendant was subsequently convicted of criminal exposure to HIV and acquitted of aggravated rape. Id. at *1. On appeal, this court concluded that joining the second indictment after the first trial was not permissible because it violated Rule 8(a)'s stated purpose of prohibiting the State from "saving back" charges arising from the same criminal conduct when the State was aware of the additional charges at the beginning of prosecution. Id. at *4 (quoting Tenn. R. Crim. P. 8, Advisory Comm'n Cmt.). The Person court's discussion of "carving . . . or holding back," as phrased by the trial court in the present case, was in the context of consolidation of indictments and Rule 8(a) only. That section of the opinion did not pertain to Rule 14 severance.

In fact, in regard to severance, Person states that "[in] cases of mandatory joinder, when the defendant asks for a severance prior to trial, 'the court shall grant a severance of offenses . . . when the court finds a severance appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.'" 2018 WL 447122 at *12 (quoting Tenn. R. Crim. P. 14(b)(2)). This court then concluded that consolidation of the two offenses "altered [the defendant's] ability to present his case in a way that prejudiced his defense." Id.

In this case, there was no motion to consolidate indictments because there was only one indictment with two counts. The trial court correctly found that the offenses were subject to Rule 8(a) mandatory joinder because they arose from the same conduct. However, the court's conclusion that the charges could not be severed due to double jeopardy concerns and caselaw regarding mandatory joinder was based on a misapplication of the law and in direct contradiction with the language of Rule 14(b)(2).[8,][9] Severance was available to the Defendant and the trial court.[10]

---

[8]Although the trial court stated that saving back charges was prohibited under principles of double jeopardy, our supreme court's discussion of Rule 8(a) in State v. Johnson, 342 S.W.3d 468, 473 (Tenn. 2011), in which the court examined the "same criminal episode" requirement in detail, did not reach constitutional issues. The court instead stated that the practice of saving back charges "necessitates multiple trials and adversely affects discovery, plea bargaining, and other pre-trial procedures." Id. (citing State v. Baird, 88 S.W.3d 617, 621 (Tenn. Crim. App. 2001); State v. Luther E. Fowler, No. 03C01-9207-CR-00249, 1993 WL 278468, at *7 (Tenn. Crim. App. July 27, 1993); Tenn. R. Crim. P. 8, Advisory Comm'n Cmt.).

[9] Indeed, if the applicability of mandatory joinder prohibited severance in all cases, Rule 14(b)(2) would cease to have any effect.

[10] We do not conclude whether a severance should have been granted in this case, as that would involve

Although the trial court's reasoning was based in an erroneous assumption, the court did not abuse its discretion by denying the severance because the Defendant chose to take an alternative, valid course of action—stipulating to his criminal record pursuant to James, 81 S.W.3d 751—which mitigated any prejudicial effect that substantive evidence of his convictions would have had. Under these circumstances, we cannot say that "the granting of [a] severance became a judicial duty." Carruthers, 35 S.W.3d at 522 (quoting Hunter, 222 Tenn. at 682). The Defendant is not entitled to relief on this basis.

*(c) Bifurcation*

We note that the trial court discussed bifurcation sua sponte; in particular, its belief that there was no "mechanism[] under Tennessee law that will allow this to be bifurcated." This statement is simply not correct. Had the Defendant requested bifurcation before the trial, the court could have concluded that a bifurcated proceeding was necessary "in order to avoid undue prejudice" and ordered bifurcation. State v. Nash, 294 S.W.3d 541, 546 (Tenn. 2009). We acknowledge that no procedure has been prescribed by this court or our supreme court for bifurcation proceedings in contexts involving a charge of possessing a firearm as a convicted felon.[11]

However, the Defendant never requested bifurcation before the trial. On appeal, the Defendant's brief states that the trial court "should have granted the severance and allowed bifurcation of the charges," cites case law on bifurcation to argue for separate trials, and otherwise uses the word "bifurcation" interchangeably with "severance."

Even though the Defendant's request for bifurcation on appeal is murky at best, because the trial court discussed the issue at some length, we have an adequate record on appeal to review the general applicability of bifurcation. We decline, however, to address the question raised by the trial court regarding the procedure by which bifurcation would be accomplished. The issue is not squarely before this court, and we will not address it in dicta.

As we have previously noted,

> [T]he terms 'bifurcation' and 'severance' are not interchangeable. Bifurcation concerns splitting a charge into two separate determinations involving guilt and punishment by the same jury, whereas severance deals

---

making findings of fact in lieu of the trial court.

[11] The court noted with some concern that no appellate caselaw existed where a defendant had requested bifurcation and been denied. Bifurcation is widely used in the context of multiple-offense driving under the influence charges, and caselaw discussing bifurcated proceedings exists as far back as 1965. See Harrison v. State, 217 Tenn. 31, 34 (Tenn. 1965); State v. Brewer, 932 S.W.2d 1 (Tenn. Crim. App. 1996) (concluding that a bifurcated trial was not mandatory in a securities fraud case).

with separating a charge from other charges in the indictment and trying them individually. See, e.g., [Richardson, 2018 WL 821775, at *22-23, f.12,] Carlos Smith v. State, No. W2016-01087-CCA-R3-PC, 2017 WL 2730398, at *7 (Tenn. Crim. App. June 26, 2017) ("[I]t is likely that trial counsel was intending to seek bifurcation of the felon in possession charge prior to trial but he erroneously moved for severance of the charges."); State v. Zacheriah Holden, No. M2010-00811-CCA-R3-CD, 2013 WL 871326, at *20 (Tenn. Crim. App. Mar. 8, 2013) ("Therefore, there is no basis upon which to grant a severance of DUI, fourth offense from the charges of aggravated vehicular homicide. To the contrary, the initial proof needed for the DUI, fourth offense charge is also required for the initial proceedings under the statutory required bifurcated proceeding to prove vehicular homicide."); see also BLACK'S LAW DICTIONARY 163, 1374 (6th 1990).

Richardson, 2018 WL 821775, at *22-23, f.12. The Defendant refers to State v. Foust, 482 S.W.3d 20, 46-47 (Tenn. Crim. App. 2015) (citations omitted), wherein this court stated as follows:

[W]e note that the better procedure where, as here, the defendant is charged with offenses involving the use of violence and force and also charged with the status offense of unlawful possession of a firearm for having a similar prior felony conviction would be to bifurcate the proceedings . . . .

Although Foust recommended bifurcation, none of the opinions of this court have required bifurcation. Ultimately, in Foust, this court affirmed a stipulation between the defendant and the State that the defendant had "a previous felony conviction involving force" and "a previous felony conviction involving violence." 482 S.W.3d at 46. Moreover, our supreme court has held that, with respect to status offenses, like the unlawful possession of a firearm offense at issue here, "specific reference[s] to [a] defendant's prior felonies" are "relevant to establish an essential element of the crime for which the defendant is being tried." James, 81 S.W.3d at 760-61; see Foust, 482 S.W.3d at 47. Here, after the trial court denied the Defendant's severance request, the Defendant agreed to stipulate to four prior felony convictions involving the "use or attempted use of violence."

Although the trial court's statements regarding the availability of bifurcation were erroneous, the statements were harmless in light of the Defendant's choosing to stipulate to his prior convictions. Even though bifurcation would have been a preferable procedure, in the absence of a motion from the parties, the Defendant's stipulation to his criminal record was sufficient to ensure he received a fair trial. This court has noted that stipulating to prior felonies and requesting bifurcated proceedings are both valid avenues

-19-

for a defendant charged with possession of a firearm as a convicted felon. State v. Carlos Smith, No. W2012-01931-CCA-R3-CD, 2013 WL 12182606, at *4 (Tenn. Crim. App. Aug. 29, 2013). The Defendant's conviction for possession of a firearm by a convicted felon is affirmed.

### III. *Sufficiency of the Evidence*

The Defendant's contention, in its entirety, is that the evidence was insufficient to sustain his convictions because "there were inconsistencies between the State's witnesses" such that "a jury could not look to all the inconsistencies presented at trial and conclude that [the Defendant was] guilty." The Defendant's brief gives no examples of such inconsistencies. The State responds that the jury, by its verdict, resolved any inconsistencies in the testimony in favor of the State and that the evidence was sufficient. We agree with the State.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See Bland, 958 S.W.2d at 659.

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First-degree murder is defined, in relevant part, as the "premeditated and intentional killing of another." Tenn. Code. Ann. § 39-13-202. Tennessee Code Annotated section 39-17-1307(b)(1)(A) provides that a person commits an offense "who

unlawfully possesses a firearm" and "[h]as been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon."

In this case, Mr. Griggs testified that the Defendant came to his house after their friend Mr. Miller was shot, that the Defendant was upset, and that on the way to the hospital to visit Mr. Miller, Mr. Griggs and the Defendant stopped at Ms. Townsel's house, where the victim and others were present. No arguments or disagreements arose inside the house. The Defendant left the house, and Mr. Griggs, the victim, and another man left shortly thereafter. Mr. Griggs saw the Defendant at the front gate speaking to Joshua, then the Defendant told the victim, "You set up my bro," pulled out a gun, and shot at him five or six times. The victim ran toward the house and denied setting anyone up. After the Defendant ran out of bullets, he pulled out another gun and Mr. Griggs had to dissuade him from shooting toward the house. From the front porch, Matthew corroborated Mr. Griggs's statement that he saw the Defendant shooting at the victim. Although Ms. Townsel did not witness the shooting, the victim repeated to her that he had not set anyone up, and Matthew told Ms. Townsel that the Defendant had shot the victim. Mr. Griggs drove the Defendant to the Defendant's brother's apartment after the shooting. Mr. Griggs and Matthew identified "Lil B" as the shooter, and Ms. Townsel confirmed that the Defendant was known as "Lil B." The victim's autopsy reflected that he died from the gunshot wound to the right flank, which perforated the aorta and caused fatal blood loss. Relative to premeditation, the Defendant calmly discussed with Mr. Griggs that he wanted Mr. Griggs to retaliate if anyone attacked the Defendant in the same manner as Mr. Miller. After the shooting, the Defendant could not be located for months and was only arrested after the Memphis Police Department enlisted the help of the United States Marshals, evidencing a "consciousness of guilt." The evidence was sufficient for a reasonable trial of fact to conclude that the Defendant committed premeditated first degree murder.

Relative to possession of a firearm by a convicted felon, it was stipulated that the Defendant had four prior convictions involving the use or attempted use of violence and that the Defendant had been instructed by the criminal court not to possess or handle firearms. The evidence was sufficient for the jury to find that the Defendant possessed at least one gun during the shooting in spite of his felon status. The Defendant is not entitled to relief on this basis.

## CONCLUSION

Upon the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE